# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

KEVIN RAY HOLMES,

    Plaintiff

v.

ISIDRO BACA, et. al.,

    Defendants

Case No.: 3:17-cv-00320-RCJ-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 44

This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 44, 44-1 to 44-10, errata at 44-1 to 44-3.) Plaintiff filed a response. (ECF Nos. 48, 48-1 to 48-4.) Defendants filed a reply. (ECF No. 49.)

After a thorough review, it is recommended that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Second Amended Complaint (SAC) ECF No. 8.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC) and Warm Springs Correctional Center (WSCC). (*Id.*) Defendants are Isidro Baca, James Dzurenda, Shannon Moyle, and Holly Skulstad.

Defendant Brian Ward was dismissed for lack of service under Federal Rule of Civil Procedure 4(m).

On screening, the court allowed Plaintiff to proceed with a Fourteenth Amendment equal protection claim alleging racial discrimination against Skulstad, and a retaliation claim against Baca, Moyle, Skulstad and Dzurenda. (ECF Nos. 7, 9.)

Plaintiff, who is African American, alleges that he was racially discriminated against by Skulstad, when two unit gym porter positions were awarded to white inmates instead of Plaintiff, despite the white inmates being disciplined in the past. Plaintiff avers that he has observed Skulstad employ policies that are racially discriminatory, such as segregating African American inmates from white inmates and refusing to submit African American inmates' requests for job classification, except for remedial, non-paying jobs, while submitting white inmates' requests, even where the African American inmates were more qualified. When he applied for a gym porter position, he was the only African American inmate found to meet all the classification requirements for the position; however, the gym porter positions were given to white inmates.

Plaintiff alleges that the Defendants retaliated against him after he filed grievances and lodged a complaint with the Department of Justice (DOJ) about Skulstad's discrimination in 2015, and after he filed this lawsuit in May of 2017. Specifically, he claims that after he filed his grievances and DOJ complaint, he was "level reduced," and in June of 2017, following the filing of this lawsuit, he was transferred to WSCC.

Defendants move for summary judgment, arguing: (1) Skulstad did not racially discriminate against Plaintiff; (2) Defendants did not retaliate against Plaintiff; and (3) they are entitled to qualified immunity.

## II. LEGAL STANDARD

The legal standard governing this motion is well settled: a party is entitled to summary judgment when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome of the case. *Id.* at 248 (disputes over facts that might affect the outcome will preclude summary judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson*, 477 U.S. at 250.

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477 U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that one party must prevail as a matter of law"). In considering a motion for summary judgment, all reasonable inferences are drawn in the light most favorable to the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach & Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and

1  determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255;

2  *Anderson*, 477 U.S. at 249.

3      In deciding a motion for summary judgment, the court applies a burden-shifting analysis.

4  "When the party moving for summary judgment would bear the burden of proof at trial, 'it must

5  come forward with evidence which would entitle it to a directed verdict if the evidence went

6  uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing

7  the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp.*

8  *Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations

9  omitted). In contrast, when the nonmoving party bears the burden of proving the claim or

10  defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate

11  an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving

12  party cannot establish an element essential to that party's case on which that party will have the

13  burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

14      If the moving party satisfies its initial burden, the burden shifts to the opposing party to

15  establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

16  *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine

17  dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute

18  be shown to require a jury or judge to resolve the parties' differing versions of truth at trial."

19  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)

20  (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment

21  by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475

22  U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

23

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Rule 56(d) Request**

In his motion, Plaintiff asserts that Defendants did not comply with discovery requests

because they did not produce the NOTIS entries he asked for, and did not respond to a request

for records concerning the collection of biological samples from Plaintiff on September 13, 2018

at WSCC. He asserts that he filed a motion to compel with respect to these issues, and refers to

Federal Rule of Civil Procedure 56(f), which is now Rule 56(d).

Under Rule 56(d), if the non-moving party shows by affidavit or declaration that he

cannot present facts essential to justify the opposition, then the court may consider deferring or

deny the motion; allow time to take discovery; or issue any other appropriate order. Fed. R. Civ.

P. 56(d).

"Rule 56(d) provides a 'device for litigants to avoid summary judgment when they have

not had sufficient time to develop affirmative evidence.'" *Stevens v. Corelogic, Inc.*, 899 F.3d

666, 678 (9th Cir. 2018) (quoting *United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1000

(9th Cir. 2002)). "A party seeking additional discovery under Rule 56(d) must 'explain what

further discovery would reveal that is essential to justify [its] opposition to the motion[ ] for

summary judgment.'" *Id*. (quoting *Program Eng'g, Inc. v. Triangle Publ'ns, Inc.*, 634 F.2d 1188,

1194 (9th Cir. 1980) (alterations original, quotations omitted). "[T]he evidence sought must be

more than 'the object of pure speculation.'" *Id*. (citation omitted). "A party seeking to delay

summary judgment for further discovery must state 'what other *specific* evidence it hopes to

discover [and] the relevance of that evidence to its claims.'" *Id*. (quoting *Program Eng'g*, 634

F.2d at 1194) (alteration and emphasis original). "In particular, '[t]he requesting party must show [that]: (1) it has set forth in affidavit form *the specific facts* it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment.'" *Id.* (quoting *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008)) (emphasis and alteration original).

The court has issued an order denying Plaintiff's motion to compel. (ECF No. 51.) Moreover, Plaintiff has not otherwise set forth any viable discovery that needs to be completed so as to justify an order under Rule 56(d). Therefore, Plaintiff's request should be denied.

**B. Timeliness**

Plaintiff argues that Defendants' motion for summary judgment was untimely. The Scheduling Order required dispositive motions to be filed by February 17, 2020. Defendants filed their motion on February 18, 2020. While technically untimely, Plaintiff was not prejudiced by the filing of the motion one day late, and the court will exercise its discretion to consider the motion. In the future, defense counsel is advised to file motions within the parameters of the scheduling order or risk the motion being denied.

**C. Equal Protection - Skulstad**

**1. Standard**

"Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff v. McDonnell* 418 U.S. 539, 556 (1974); *Mitchell v. Washington*, 818 F.3d 436, 444 (9th Cir. 2016); *Harrington v. Scribner*, 785 F.3d 1299 (9th Cir. 2015). In *Johnson v. California*, 543 U.S. 499 (2005), "the Supreme Court was unequivocal that strict scrutiny is the proper standard of review for an equal protection challenge to a race-based prison policy." *Harrington*, 785 F.3d at 1305 (citing *Johnson*, 543 U.S. at 515).

This requires "the government to prove that the measures are narrowly tailored to further a compelling government interest." *Id*. at 1306 (quoting *Johnson*, 543 U.S. at 509). "The necessities of prison security and discipline, are a compelling government interest justifying only those uses of race that are narrowly tailored to address those necessities." *Id*. at 512 (quotation marks and citation omitted).

### 2. Evidence and Argument

According to Skulstad, during the relevant time period she was a caseworker assigned to Unit 10 at NNCC, which was Plaintiff's unit. (Skulstad Decl., ECF No. 44-8 ¶ 5.) Unit 10 was a level 1 worker's unit, and Plaintiff was assigned as a gym porter worker. (*Id*. ¶ 8.) All gym workers were suspended from their jobs on May 13, 2015. (*Id*. ¶ 9.) She was not the person who made the decision to suspend the porter jobs; however, she notified Plaintiff that all gym workers were being "unassigned" and that he was able to seek other employment. (*Id*. ¶¶ 10-11; ECF No. 44-1 at 3.) She asserts that each person removed from their job as a gym worker was told they had to find a job to remain in level 1. (Skulstad Decl., ECF No. 44-8 ¶ 11.) Plaintiff did not find another job assignment, and was moved to another unit on July 6, 2015. (Skulstad Decl., ECF No. 44-8 ¶ 12.) Skulstad states that there was always an "ethnic balance" with the porters in the unit, so "if in this instance, [she] hired a 'white' inmate as a porter it would have been to replace another 'white' inmate." (*Id*. ¶ 14.) Insofar as Plaintiff claims that she would fail to put Black inmates in for job assignments, she maintains that each kite received would be reviewed for qualifications and those who were qualified would be submitted for full classification, no matter the inmate's race or ethnic background. (*Id*. ¶ 15.)

Plaintiff submitted several grievances regarding his gym porter position. First, Plaintiff submitted an informal level grievance, number 20063003258, on June 24, 2015, stating that he

was suspended/terminated from his work assignment without first being served with a notice of charges. (ECF No. 44-2 at 7.) Skulstad responded to the informal level grievance on July 28, 2015, and advised Plaintiff that on May 12, 2015, he was notified that all gym workers were being unassigned and that he was able to seek other employment; the decision was to remove all gym workers so Plaintiff was not being singled out; and, it was not a disciplinary matter so he had no right to due process or appeal of the decision. (ECF No. 44-2 at 6.)

In his first level grievance dated August 23, 2015, Plaintiff stated that he was terminated from his work assignment where he was earning good-time credits without his federally mandated due process (notice of charges). (ECF No. 44-2 at 3.) On November 1, 2015, Baca responded that Plaintiff was not entitled to work credits, and the warden may decide to re-structure any area or policy without having an offense issued. (ECF No. 44-2 at 2.)

Plaintiff submitted his second level grievance on December 9, 2015, stating that all inmates have the right to earn good time credits, and they cannot be terminated without due process and a notice of charges. (ECF No. 44-2 at 5.) H. Wickham responded, stating Plaintiff was answered correctly at the informal and first and second levels, noting that the warden removed all gym workers, not Skulstad, and Plaintiff was advised to secure another job where he would receive work credits. (ECF No. 44-2 at 4.)

Plaintiff had submitted a second grievance, number 20063004289, on July 7, 2015, stating that he had been racially discriminated against by Skulstad. He asserted that he applied for a porter position, but was not taken to classification or considered for the position. Two inmates were taken to classification and were assigned the positions a month after Plaintiff had applied and was not taken to classification. He claimed that Skulstad placed a white man in the position who had just been fired from or otherwise left the culinary, and then on July 6, 2016,

Skulstad did a "level reduction" after she had shown favoritism toward the white man by giving him the job Plaintiff for which Plaintiff had applied.  He complained that both porter positions were given to white inmates. He stated that other Blacks applied for jobs through Skulstad, and were not even considered for classification even though they were qualified. He also claimed that Skulstad would not assign inmates of different races to the same bunk. He asserted he was "level reduced" without a write up or infraction, but white inmates with pending write ups were still housed in Unit 10. In addition, white inmates who had not had a work assignment for months were still allowed to be level 1, but there were no Black inmates living in level 1 without a work assignment. He further claimed that Skulstad did not seem comfortable submitting a Black inmate for classification for a work assignment unless the job assignment was remedial (culinary or yard labor). (ECF No. 44-3 at 3; ECF No. 48-4 at 7-10.)

M. Moses responded stating that the regulations did not create a liberty interest or right to any classification status, employment or placement; that his allegations were unfounded; and, that there was an appropriate racial balance and qualified candidates were in the positions to which he referred. (ECF No. 44-3 at 2; ECF No. 48-4 at 11.)

In his first level grievance dated August 23, 2015, he reiterated his claim that Skulstad had been discriminating against him and other Black inmates in hiring as well as applying the rules of the system, stating that she removes Black inmates from level 1 while white inmates are allowed to remain. (ECF No. 44-3 at 5; ECF No. 48-4 at 12-13.)

Baca was assigned to the first level grievance, and responded on September 14, 2015, that Plaintiff was not being discriminated against by Skulstad. Baca said that, per Moyle, Plaintiff was informed that all gym employees were being suspended from that job, and Plaintiff was given an opportunity to obtain other employment prior to being level reduced, as were the

other gym workers. On July 6, 2015, Plaintiff was moved from Unit 10 to Unit 5 as he still had not found a job assignment. Baca said that Skulstad was acting within the regulations as this was ample time to find employment before being moved out of Unit 10. Plaintiff was informed he would be allowed the opportunity to move back to Unit 10 once he met the requirements, and was encouraged to apply for any job he was qualified for and capable of completing. (ECF No. 44-3 at 4; ECF No. 48-4 at 14.)

Plaintiff submitted a second level grievance on October 14, 2015. (ECF No. 44-3 at 7.) Foster responded, stating Plaintiff had been given a proper response at the informal and first level; however, she said she would direct Warden Baca to have an audit review of ethnic balance in job and housing assignments at NNCC. (ECF No. 44-3 at 6.)

Skulstad argues that she did not discriminate against Plaintiff, and any issues with his inability to get a job as a gym porter were not the result of racial discrimination. He was given an opportunity to find a replacement job and keep his classification level and remain in his unit, but he refused to work. As a result, his classification was reduced.

In his response, Plaintiff points to the allegations of his verified complaint. In addition, he asserts that in response to Plaintiff's request for admission, Skulstad admits that she was ultimately the one who placed inmate workers into porter jobs. (ECF No. 48-3 at 37.)

In his declaration, Plaintiff states that while in Unit 10B, where Skulstad was the caseworker, he witnessed Skulstad institute a policy of bunk segregation which confined inmates of like race or ethnicity, when no other caseworkers assigned to the unit did this. (Pl. Dec., ECF No. 48-2 at 3 ¶ 7(a).) He also asserts that Skulstad would often not submit Black inmates for consideration for job assignments, and showed reluctance to "level reduce" white inmates. (*Id.* ¶ 7(b), (c).)

He states that the first screening for potential job assignments is done by the caseworker assigned to a unit,  which in this case was Skulstad. If she did not want Plaintiff to be employed, he would not be able to get a job. (*Id*. ¶ 8.) Plaintiff had been employed for decades, but after coming under Skulstad, he was denied a work assignment and then was accused of refusing to work when he complained. (*Id*. ¶ 9.) Skulstad said she was bound by the "ethnic balance" policy to replace a white inmate with a white inmate. (*Id*. ¶ 10.) Plaintiff maintains that Skulstad refused him a work assignment because she had to hire a white inmate. (*Id*. ¶ 11.)

### 3. Analysis

"While the Due Process Clause of the Fourteenth Amendment does not create a property or liberty interest in prison employment, … racial discrimination in the assignment of jobs violates equal protection[.]" *Walker v. Gomez*, 370 F.3d 969, 973 (9th Cir. 2004) (quotation marks and citations omitted), *overruled in part on other grounds in Johnson v. California,* 543 U.S. 499 (2005) (holding that strict scrutiny is applied to race discrimination claims by inmates, and not the deferential standard considering whether there is a legitimate penological objective in *Turner v. Safley*, 482 U.S. 78 (1987)).

In *Johnson*, the Supreme Court confirmed that strict scrutiny is applied to even "so-called 'benign' racial classifications, such as race-conscious university admission policies, … race-based preferences in government contracts, …and race-based districting intended to improve minority representation[.]" *Id.* at 505 (citing *Grutter v. Bollinger,* 539 U.S. 306, 326 (2003), *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 226 (1995), *Shaw v. Reno*, 509 U.S. 630, 650 (1993)). The Court explained the reason for applying strict scrutiny: "Racial classifications raise special fears that they are motivated by an invidious purpose. Thus, we have admonished time and again that, '[a]bsent searching judicial inquiry into the justification for such

race-based measures, there is simply no way of determining … what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" *Id*. at 505-06 (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (plurality)).

In *Johnson,* the California prison system asked the Court not to apply strict scrutiny to its policy because the policy was "neutral," *i.e.*, "it 'neither benefits nor burdens one group or individual more than any other group or individual.'" *Id*. at 506 (quoting Brief for Respondents 16). In response, the Court reiterated that "'racial classifications receive close scrutiny even when they may be said to burden or benefit the races equally.'" *Id*. (quoting *Shaw v. Reno,* 509 U.S. 630, 651 (1993)).

In *Hines v. Yousef,* 914 F.3d 1218 (9th Cir. 2019), the Ninth Circuit affirmed that "the Constitution generally demands race neutrality." *Hines,* 914 F.3d at 1234. "[*A*]*ll* racial classifications are invalid unless they pass strict scrutiny." *Id*. (quotation marks and citations omitted, emphasis original).

Preliminarily, Skulstad relies on the fact that she was not the one who made the decision to suspend all of the gym porter positions. Importantly, Plaintiff does not specifically allege that the decision to suspend the positions was discriminatory. Instead, he alleges that Skulstad discriminated against him based on his race when she did the hiring to re-fill those positions. Her responses to Plaintiff's requests for admission make it clear that she was responsible for hiring the workers in the unit.

Next, Skulstad references at least an implicit policy of "ethnic balancing" in prison jobs at NNCC[1], without describing the policy in detail. Nor does she indicate what the racial makeup

---

[1] The policy is also referenced in the second level grievance response from Foster, who said she would direct Warden Baca to have an audit review of ethnic balance in job and housing

for the gym porter positions was prior to the time Plaintiff was suspended from his job, and after the positions were re-filled. Skulstad does say that if she hired a white inmate to re-fill the porter position, it would have been to fill a spot that had previously been held by a white inmate, intimating that race was a factor in the hiring decision. There was at least one Black porter before the suspension (i.e., Plaintiff), and Plaintiff contends that after the suspension, the two gym porter positions were filled by white inmates. This raises a factual issue as to whether race was a factor in the hiring decision, and whether Skulstad was in fact effectuating "ethnic balancing."

Skulstad simply argues that she did not discriminate against Plaintiff, but she at least implicitly raises a policy that takes race into account in hiring, without specifically discussing whether this policy serves a compelling governmental interest and is narrowly tailored to meet that interest.

Moreover, Plaintiff has raised a genuine dispute of material fact as to whether Skulstad intentionally treated Plaintiff differently than similarly situated inmates based on his race. While Skulstad maintains that she was not the one that put the suspension of all gym porters in place, she admits that she was the one who ultimately placed inmate porters into their positions. Plaintiff presents evidence that he had been in the porter position for some time and had a good disciplinary record, and was qualified for the porter position, but was not even submitted to the full classification committee for review. At the same time, he asserts that he was more qualified than the other applicants, who were white, who were sent to full classification, and ultimately were chosen for the positions.

---

assignments at NNCC. As Plaintiff points out, "ethnic balancing" is not mentioned in the applicable Administrative Regulation (AR).

Plaintiff also presents evidence that Skulstad had a practice of segregating inmates in bunks based on their race. In addition, while Plaintiff's level was reduced for not obtaining a job after he was suspended from the gym porter position without being issued a notice of charges, he maintains that white inmates who had charges pending, and who had not had a job in months, were allowed to stay in level 1 housing. He asserts that, by contrast, there were no Black inmates in level 1 without a job.  Finally, Plaintiff states in his declaration that Skulstad seemed to only submit Black inmates for classification for remedial work assignments in the culinary or on yard labor.

These factual issues preclude the entry of summary judgment in Skulstad's favor.

Skulstad also argues that she is entitled to qualified immunity.

The qualified immunity analysis consists of two steps: (1) viewing the facts in the light most favorable to the plaintiff, did the defendant violate the plaintiff's rights; and (2) was the right clearly established at the time the defendant acted. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc), *cert. denied*, 137 S.Ct. 831 (Jan. 23, 2017).

Here, viewing the facts in the light most favorable to Plaintiff, a reasonable factfinder could conclude that Skulstad did treat him differently because of his race. With respect to the clearly established prong of qualified immunity, the court finds that there are too many disputed issues of fact, as well as many material facts that were not set forth or addressed by Skulstad relative to the implicit "ethnic balancing" policy, that preclude the court from resolving the clearly established prong of the qualified immunity analysis at this juncture.

For these reasons, Skulstad's motion for summary judgment should be denied.

**D. Retaliation**

The screening order construed Plaintiff's SAC as asserting a retaliation claim against Baca, Ward, Moyle and Skulstad, based on allegations that he was transferred to a more restrictive institution, and his level was reduced in retaliation for his protected activity. (ECF No. 9 at 7.)

**1. Standard**

"Section 1983 provides a cause of action for prison inmates whose constitutionally protected activity has resulted in retaliatory action by prison officials." *Jones v. Williams*, 791 F.3d 1023, 1035 (9th Cir. 2015); *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995). Such a claim consists of five elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Jones*, 791 F.3d at 1035 (quoting *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005)).

"The First Amendment guarantees a prisoner a right to seek redress of grievances from prison authorities as well as a right of meaningful access to the courts." *Id.* (citing *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995)).

There must be evidence to establish a link between the exercise of constitutional rights and the allegedly retaliatory action. *Pratt*, 65 F.3d at 806-07. "[A[ plaintiff must show that his protected conduct was the 'substantial' or 'motivating' factor behind the defendant's conduct." *Brodheim v. Cry*, 574 F.3d 1262, 1271 (9th Cir. 2009) (quotation marks and citation omitted). The plaintiff "need only put forth evidence of retaliatory motive, that, taken in the light most

favorable to him, presents a genuine issue of material fact as to [the defendant's] intent." *Id.* (internal quotation marks and citation omitted).

To raise a triable issue as to motive, plaintiff must offer "either direct evidence of retaliatory motive or at least one of three general types of circumstantial evidence [of that motive]." *McCollum v. Cal. Dep't of Corr. and Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (citation and quotation marks omitted). Circumstantial evidence of motive may include: "(1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse … action were false and pretextual." *Id.* (citation and quotation marks omitted). Mere speculation that there is a causal connection is insufficient to raise a genuine issue of material fact. *See Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (citations omitted) (affirming grant of summary judgment where there was no evidence that the defendants knew about plaintiff's prior lawsuit, or that defendants' disparaging remarks were made in reference to the prior lawsuit).

**2. Analysis**

**a. Level Reduction**

Plaintiff alleges that he filed his grievance (20063003258) challenging his termination from the gym porter position without a notice of charges on June 24, 2015, and on July 6, 2015, his level was reduced to a more restrictive level.

Defendants assert that Plaintiff's classification level was reduced because he refused to accept a work assignment, and was not in retaliation for exercising his First Amendment rights. To achieve a medium security institutional level of 1, inmates must be assigned to and participate in full time work. Administrative Regulation (AR) 516 discusses NDOC's level system, and each

16

level is to have a performance-based criteria that includes, but is not limited to: work, disciplinary, program compliance, appearance, and environment. (ECF No. 44-6 at 2-3.) Inmates shall progress through the level system when eligible. (*Id*. at 3.) Level 1 allows the maximum number of privileges. (*Id*. at 4.) The following is the criteria for level 1 inmates: full-time work assignment, no major disciplinary convictions in the past 12 months; active involvement, participation and attendance; appearance including maintaining hygiene and grooming standards and a clean and orderly living area and compliance with all housing rules and operational procedures. (*Id*. at 4-5.)

Operational Procedure (OP) 516 also governs the level system. There are three levels in the system, and each level refers to an inmate's housing designation and permitted activities. The level is determined by a full classification committee decision, based on determined criteria, available housing and the Warden's approval. (ECF No. 44-10 at 2.) Level 1 is the least restrictive. (*Id*. at 3.) Removal from a level can be effectuated by a sub-classification committee decision and can be based on formal disciplinary action, documented staff reports of misbehavior or failure to continue to achieve the objectives of the currently assigned level. (*Id*.) Inmates in level 1 must have a job. (*Id*.) Level 1 inmates who, after obtaining a job, refuse to work that job or other work assignments, will receive a notice of charges and a level reduction. (*Id*. at 4.) Inmates must be in compliance with all housing rules and operations procedures to remain in Level 1. (*Id*.)

The evidence reflects that Plaintiff was suspended from his gym porter job at NNCC on May 13, 2015. (Skulstad Decl., ECF No. 44-8 ¶ 9.) Skulstad notified Plaintiff that day that all gym workers were being unassigned and that he was able to seek other employment. (*Id*. ¶ 10;

1    ECF No. 44-1 at 3.) Skulstad maintains that each person suspended from their position was told

2    that they had to find a job to remain in level 1. (Skulstad Decl., ECF No. 44-8 ¶ 11.)

3            Plaintiff filed his informal level grievance on June 24, 2015, stating that he was

4    suspended from his work assignment without having been served with a notice of charges.

5    (ECF No. 44-2 at 7.) According to Skulstad, Plaintiff's level was reduced on July 6, 2015, when

6    he had not gotten another job. (Skulstad Decl., ECF No. 44-8 ¶ 12.)

7            There is no evidence that Baca, Moyle or Dzurenda had any involvement in Plaintiff's

8    level being reduced. Baca was assigned to respond to a subsequent level of Plaintiff's grievance

9    well *after* his level had been reduced, and there is no evidence that Moyle or Dzurenda had any

10   knowledge or involvement in Plaintiff's grievance and level reduction in July of 2015. Therefore,

11   summary judgment should be granted in favor of Baca, Moyle and Dzurenda with respect to this

12   aspect of the claim. The court's inquiry will now focus on whether Plaintiff has raised a genuine

13   dispute of material fact as to whether Skulstad retaliated against him in reducing his level.

14           Skulstad asserts that when the jobs were suspended in May of 2015, all the inmates were

15   informed that they would have to find another job to remain in level 1. Skulstad maintains that

16   Plaintiff's level was reduced in accordance with prison regulations and procedures because he did

17   not have a job as of July 6, 2015.

18           Plaintiff does not dispute that Skulstad told him, and the other inmates whose positions

19   were suspended, in May of 2015, that when the gym porter positions were suspended that they

20   would need to find another job to remain in level 1. Plaintiff alleges that he was retaliated against

21   after he grieved the discriminatory conduct; however, Plaintiff's June 24, 2015 grievance was

22   focused on his argument that he should have been given a notice of charges when his gym porter

23

position was terminated, and he was denied his due process rights. He filed the grievance

alleging racial discrimination against Skulstad until the day *after* his level was reduced. On

July 6, 2015, Plaintiff did not have a job, and so his level was reduced, consistent with Skulstad's

prior statement that this would occur. Skulstad did not respond to the informal level grievance

until July 28, 2015, and consistent with her earlier representation, she advised Plaintiff that he

had been notified he was able to seek other employment.

There is no indicia of retaliatory motive; instead, the evidence reflects that when Plaintiff

did not secure another job, his level was reduced. Skulstad had also informed him this would

occur *before* the filed his grievance. Insofar as Plaintiff claims that was not consistent with what

was occurring with white inmates in the unit, that is the subject of his equal protection claim.

Plaintiff also references his complaint to the DOJ, but his own evidence reflects that he

did not send his letter to the DOJ until December 14, 2015 (ECF No. 48-3 at 27), which is five

months *after* his level was reduced. Therefore, there is no evidence that his level was reduced

because he initiated a complaint with the DOJ.

Plaintiff has not raised a genuine dispute of material fact with respect to his claim that he

was retaliated against for filing a grievance when his level was reduced on July 6, 2015;

therefore, summary judgment should also be granted in favor of Skulstad as to this aspect of the

retaliation claim.

### b. Transfer

Plaintiff alleges that Defendants retaliated against him for filing this lawsuit when he was

transferred to WSCC in July of 2017.

Defendants argue that they did not transfer Plaintiff from NNCC to WSCC in retaliation

for grieving, complaining or litigating, but instead he was transferred for administrative reasons:

the need for bed space. AR 522 governs intra-departmental transfers, and provides that an inmate may be involuntarily transferred between facilities, but if a transfer does not result in an increase in custody, it is not considered involuntary. (ECF No. 44-7 at 3.)

 Plaintiff filed this lawsuit on May 19, 2017. (ECF No. 1-1.) He was transferred from NNCC to WSCC two months later, on July 19, 2017. (ECF No. 44-1 at 7.)

Defendants point to the responses to Plaintiff's grievance about his transfer to support their position that he was transferred for administrative reasons, and not in retaliation for filing this lawsuit.

Plaintiff filed a grievance, number 20063052880, on August 5, 2017, stating that he filed this lawsuit on May 13, 2017, naming Baca, Moyle, and Skulstad as defendants. Then, on July 19, 2017, after almost two decades at NNCC and with no disciplinary history, in retaliation for filing his lawsuit, they reclassified him to WSCC. (ECF No. 44-5 at 8-9.) K. Mattice responded that he did not have a liberty interest in choosing where he is housed, and there are various administrative reasons why he could have been moved, and it was not retaliation but a classification action. (ECF No. 44-5 at 7.)

In his first level grievance he claimed that the grievance responder worked with the defendants. (ECF No. 44-5 at 6.) Baca responded to the first level grievance, stating that department need is the primary reason for inmate housing transfers and that this occurs on a normal basis; there was no need for him to be housed specifically at NNCC, medically or otherwise; and he was being afforded program and work opportunities while housed at WSCC; and there was no retaliation. (ECF No. 44-5 at 5.)

Plaintiff filed a second level grievance on March 24, 2018, standing by his claim of retaliation. (ECF No. 44-5 at 3.) H. Wickham responded that if a transfer does not result in an

increase of custody, it is not considered to be an involuntary transfer, and Plaintiff was transferred between two medium security facilities. In addition, there was no proof of retaliation or adverse classification. (ECF No. 44-5 at 2.)

Plaintiff argues Defendants have not demonstrated that he would have been transferred had he not grieved and complained. He claims that Baca, Moyle and Dzurenda did have the authority to effectuate the transfer, and without this authority the transfer would have been impossible. Next, Plaintiff states that after he filed the DOJ complaint and grievance against Skulstad, he was submitted for transfer by Caseworker Hanna in 2015, but the transfer was denied. (Pl. Decl., ECF No. 48-2 at 7 ¶ 19B.) Then, after he filed this lawsuit, he was again submitted for transfer, and was transferred to WSCC. (*Id*. ¶ 19C.)

Plaintiff goes on to assert that Baca ordered Plaintiff to be issued a notice of charges for threats, which was later dismissed as unsubstantiated. (*Id*. ¶ 19D.)[2]

Plaintiff also provides a declaration from inmate John Quintero, who states that in 2017 he was acting as inmate assistant to other inmates, and was requested by the inmates to file a motion for temporary restraining order against Baca and others because he cancelled medical orders for Styrofoam tray take home meals for those with a medical need, and filed other complaints, and on November 2, 2017, Quintero was transferred without notice to another facility. (ECF No. 48-3 at 31-32.)

---

[2] Plaintiff provides a notice of charges dated September 6, 2016, from Sergeant Tolotti, which states that he received information that Plaintiff had physically threatened the life of another inmate, and this information was passed to Warden Baca, and "[p]er Warden Baca [Plaintiff] [was to] receive th[e] [Notice of Charges]." (ECF No. 48-4 at 45-51.)

Finally, Plaintiff asserts that on September 13, 2018, he was made subject to a biological specimen extraction even though the state law does not apply to him, and Defendants have refused to produce the documentation to prove their involvement. (*Id*. ¶ 19E.)

While the parties may dispute whether his transfer to WSCC could be considered adverse action for the purposes of a retaliation claim since it was to another medium security facility, the court finds that Plaintiff has not raised a genuine dispute of material fact in response to Defendants' evidence that he was not transferred because of his protected conduct.

Defendants present evidence that Plaintiff was transferred for administrative reasons and not in retaliation for his lawsuit or grievances. Plaintiff has not submitted any evidence to create a genuine dispute of material fact as to this aspect of his retaliation claim.

First, Plaintiff contends that Baca, Moyle and Dzurenda had the "authority" to transfer Plaintiff, but he provides no evidence that they were actually involved in his transfer.

Second, Plaintiff references the filing of his DOJ complaint and his grievance against Skulstad in 2015, and the fact that he was purportedly submitted for a transfer by Caseworker Hanna in 2015, but he provides no evidence of a connection between his protected activity in 2015, the submission for transfer by Hanna (who is not a defendant) in 2015, and his transfer to WSCC in July of 2017.

Third, Plaintiff references a notice of charges for threats issued by Baca that was eventually dismissed as evidence of retaliatory motive; however, this notice of charges was issued nearly a year before Plaintiff was transferred to WSCC, and Plaintiff again provides no evidence of a connection between that notice of charges and his transfer in 2017.

Fourth, the declaration of Quintero provides no evidence that Baca, or any other Defendant, had anything to do with *Plaintiff's* transfer to WSCC in July of 2017.

Finally, Plaintiff argues that the fact that he had to give a biological specimen in September of 2018 is evidence of retaliation; however, he provides no evidence of Defendants' involvement in the extraction of the specimen. Nor is there any evidence connecting his transfer in July of 2017, to this event in September of 2018.

For these reasons, summary judgment should be granted in Defendants' favor as to this aspect of the retaliation claim.

## IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order:

(1) **DENYING** Plaintiff's request under Rule 56(f), now Rule 56(d);

(2) **DENYING** Defendants' motion (ECF No. 44) as to the equal protection claim against Skulstad; and **GRANTING** Defendants' motion as to the retaliation claim.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: July 1, 2020

William G. Cobb
United States Magistrate Judge

23